Luke Joseph PERRICONE,
Plaintiff–Appellee,

v.

The KANSAS CITY SOUTHERN
RAILWAY COMPANY,
Defendant–Appellant,

v.

UNITED STATES FIDELITY AND
GUARANTY COMPANY,
Intervenor–Appellee.

No. 79–2289.

United States Court of Appeals,
Fifth Circuit.
Unit A

Nov. 12, 1980.

**318**

Roger S. McCabe, Beaumont, Tex., Brian R. Davis, Austin, Tex., for defendant–appellant.

Gilbert Adams, Jr., Richard J. Clarkson, Beaumont, Tex., for United States Fidelity and Guaranty Co.

W. E. Harper, Beaumont, Tex., for plaintiff–appellee.

Before COLEMAN, Chief Judge, RUBIN and WILLIAMS, Circuit Judges.

COLEMAN, Chief Judge.

This is a diversity action against the defendant railroad for personal injuries and property loss allegedly sustained in a one car accident which occurred while the plaintiff, Luke Joseph Perricone, on the clear, dry day of January 23, 1976, was driving his 1970 Plymouth across the defendant's railroad tracks at the Archie Street crossing in Beaumont, Texas. There was a jury verdict of $170,000 in favor of the plaintiff, which we reverse and remand for a new trial.

Liability was asserted in that the railroad had neglected its duty to build and keep the crossing in proper condition for the use of the traveling public and had failed to warn drivers of hazardous conditions allegedly there existing. It was claimed that while Perricone, in a prudent manner, was driving across the crossing "his automobile bottomed out and was caused to come to a sudden, abrupt, and dead stop, slamming him against the inside of his car and the steering wheel, causing him personal injury and causing damage to both Perricone and his automobile."

Perricone, age 39, born and raised in Beaumont, had worked for National Life Insurance Company for about seven years. Near the beginning of the lunch hour, in response to a telephone call from a client who was preparing to leave town, he set out for the client's office to collect an insurance debit. Four railroad tracks traversed the street. Perricone testified that he was going five to ten miles an hour, that everything was smooth as he crossed the first two tracks, but "as he went onto the third track the rail was sticking up and it caught the front end of my car and buckled the car up."

"I hit my head against the windshield, busted my mouth on the steering wheel, busted my lip on which I had stitches, my cheek was busted, my head was busted, and I had internal injuries. My head was hurt, and I was just all banged up."

Perricone said that there was a big drop-off after crossing the first two tracks. Although he lived within a mile or two of the crossing, he said that he could not "remember" ever crossing the crossing on any previous occasion.

After the alleged impact, he got out of the car, went to a nearby telephone, and called his wife. She came for him and took him to a hospital, where he remained for five days. He afterwards remained at home for about twelve days. Subsequently, in June, he was at home for about twenty one days. He had some physical therapy at Saint Elizabeth Hospital, beginning in November, 1978, nearly three years after the accident.

He said he had had no trouble with his teeth before the accident but he did have four teeth missing. Subsequent to the accident, three teeth had been taken out, the last one in January, 1979. His dentist testified that as a result of the accident, he capped three teeth which had been fractured. According to the dentist, in the three ensuing years, six upper teeth suffered denervation and Perricone could expect dental fees of about $2,075 as a result of that development.

Perricone testified that since the accident he had been suffering pain which started in his neck and ran down his back. He had frontal headaches, his right eye "pulls a lot", and his right arm gives him trouble.

Dr. Lange first saw Perricone, by reference from Dr. Fugua, on May 27, 1976. The plaintiff complained of frontal type headaches and abdominal pains going back to the date of the accident. Intensive examination revealed no fracture or dislocation of the neck and no fracture of the skull. Dr. Lange was of the opinion that Perricone probably had a soft tissue injury such as those caused by whiplashes. He could find no organic cause for the headaches. There was some tenderness of the neck area. Neck motions were 70% of normal. Dr. Lange testified that his diagnosis was cervical whiplash of a chronic nature, with concomitant headaches associated. Perricone testified, however, that he had had neck pain prior to the accident.

Dr. Lange had seen Perricone three times in 1976, twice in 1977, and four times in 1978.

Perricone was hospitalized in 1976 for a "bleeding ulcer". The diagnosis was gastritis, cervical spine strain, and frontal headaches, with no organic etiology. He had a kidney stone surgically removed in 1977.

Dr. Martin R. Haig, orthopedic surgeon, of Port Arthur, examined Mr. Perricone on March 22, 1978, at the request of the railroad. He found no disc pathology in the bones of the neck. There were no broken bones or fractures. There was no ruptured disc or nerve problem. Mr. Perricone was suffering from a residual stiffness in the neck from a neck injury. Dr. Haig was of the opinion that the plaintiff had a 5% injury to his neck. It was his professional opinion that the plaintiff had no orthopedic reason for missing work from his employment as a staff manager for his employer. He thought that physical therapy was of no medical benefit to the plaintiff.

On the damage issue of lost and reasonably expected to be lost income, Mr. Perricone was earning $19,000 a year as an insurance agent at the time of the accident. He made $16,000 in 1976, $18,000 in 1977, and $21,000 in 1978. Some fourteen months after the date of the accident, at his own request, Mr. Perricone became a staff manager, because it is "less strenuous and not as demanding as an agent's job." There was no medical evidence, however, that this transfer was reasonably necessitated by physical reasons attributable to the accident. In fact, Mr. Perricone had been a staff manager for another insurance company before he began work for National Life Insurance Company. He did testify that the position of staff manager was less stressful than that of an agent but his future earnings as an agent could not be shown without resorting to speculation.

■ On the foregoing proof, and since, as hereinafter appears, the issue of liability was incorrectly tried, we consider that we have no alternative but to hold that the District Court erred when it denied the railroad's motion for a new trial on the issue of damages.

Viewing the evidence in the light most favorable to the verdict, the plaintiff sustained an earning loss of $4,000. He lost 30% of the motion in his neck. He sustained substantial damages to his teeth and dental costs occasioned thereby. He will suffer occasional periods of discomfort from the whiplash. Yet, the jury fixed his damages at $170,000. In the face of appellate attack this Court cannot sustain a verdict of that size for the injuries established by this record.

We are well aware that the trial judge denied the motion for a new trial. Moreover, an examination of the Fifth Circuit cases in this field reveals only rare instances in which the Court felt bound to set aside a jury award for its excessiveness.

The basic principles were enunciated by Judge Hutcheson in a case on which the author of the present opinion sat as one of the appellate judges, *Rosiello v. Sellman*, 354 F.2d 219 (5 Cir. 1965), in which we find the following:

The refusal to grant a new trial, sought on the ground of inadequate or excessive damages, is a matter within the sound discretion of the trial judge, whose action thereon should be overturned only in exceptional circumstances. In a long line of cases this Court has consistently empha-

sized that "the granting or denial of a new trial on the ground of excessive [or inadequate] damages is a matter of discretion with the trial court, not subject to review except for grave abuse of discretion". (Footnote and citations omitted). 354 F.2d at 219–220.

Nevertheless, *Rosiello* also recognized "the equally well settled principle that circuit courts are duty–bound to reverse the trial judge's refusal of a new trial where the judge has, as a matter of law, abused his discretion", 354 F.2d at 220.

In *Brown v. Louisiana & Arkansas Ry. Co.*, 429 F.2d 1265 (5 Cir. 1970), we recognized the factors enunciated by the Supreme Court in *Grunenthal v. Long Island R. Co.*, 393 U.S. 156, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968): (1) grossly excessive, (2) inordinate, (3) shocking to the judicial conscience, (4) outrageously excessive, (5) so large as to shock the conscience of the court, (6) monstrous.

In light of our foregoing analysis of the damages proven on behalf of the plaintiff, viewing them in the light most favorable to him, we must look upon this verdict as being grossly excessive and it must be set aside for that reason.

### The Matter of the Missing Witness

There was evidence, viewed in the light most favorable to the verdict, from which the jury could have found, as it did, that the crossing was unsafe for the use of automobiles going in excess of five to ten miles per hour. This was due to the second set of tracks being about ten feet from the first set and at an elevation about a foot lower than the first set. The focal issue in the case, however, was whether this difference in elevation, rather than the speed of the Perricone Plymouth, was a proximate cause of the accident. This was, as might be expected, hotly contested. As already stated, Mr. Perricone testified that he was going only five to ten miles an hour.

Beaumont officer Michael Manning was called to the scene of the accident. By the time he arrived, the car had been moved off the railroad track and was sitting up on all four wheels on the side of the street. There was no damage to the front part of the car or the front bumper. When one got down and looked under the car, damage to the undercarriage could be seen. The U bar under the motor was bent back. The undercarriage was "scraped". Soon afterwards, Mr. Manning talked to Mr. Perricone at the hospital. Mr. Perricone said that he had been driving 30 to 35 miles an hour when he attempted to negotiate the crossing. This testimony as to the damage to the automobile and as to the hospital statement was verified by the testimony of officer Bill Davis.

Hoyte Williams, employed adjacent to the crossing, testified that, at a speed of as much as 12 or 15 miles an hour, he had safely crossed the crossing as much as twenty five or thirty times a day, driving a cherrypicker or a forklift sometimes loaded with from four to six tons. On cross examination by plaintiff's counsel, Williams said that he had been driving across the crossing at this speed for nearly twenty three years. The issue in the case, of course, was the condition of the crossing on the day of the accident. However, having "produced" the answer counsel did not move to strike the "twenty three years" as immaterial. Instead, he invoked the procedure which we now describe and which necessitates reversal and remand for a new trial on liability.

On September 2, 1978, some four months before the trial, plaintiff filed his "Second Amended Designation of Witnesses". The name of H. J. Fontenot appeared as No. 10 on that list.

When the defense rested its case, counsel for the plaintiff moved the Court to allow him to read into evidence the testimony given by H. J. Fontenot in a state court trial in another case against the railroad for damages allegedly incurred at the same crossing.

Plaintiff's counsel said to the Court:

"I can't find the man. If I could have found him, I would have, but I can't find the man—Mr. Fontenot—anywhere and we have made a search to try to locate him and haven't been able to."

Counsel for the railroad objected on the ground that plaintiff had made an inadequate showing of the nonavailability of the witness. The District Judge said, "I feel almost certain that you are heading for error in this case...."

Since it was late in the day counsel was allowed to consider the matter overnight. The next morning, counsel insisted on his motion, again reiterating that, "we have made a diligent effort to locate Mr. Fontenot, and have been unable to do so. We don't know where this man is at all."

The Court then allowed plaintiff's counsel to read to the jury the recorded testimony of H. J. Fontenot, as given in a state court trial some eighteen months earlier, which we annex hereunto as Appendix A.

■ It must be noted that although, for weeks, Fontenot's name had, at the instance of plaintiff's counsel, been on the witness list, no witness subpoena had been issued for him.

Right after the jury returned its verdict, the railroad claim agent went to work to see if he could find the missing witness. In about two hours Fontenot was found, at work, about a mile from the courthouse.

The transcript in the hands of counsel, admitted in evidence, showed that when Fontenot testified in the other trial he lived in China, Texas–near Beaumont. The record, developed after Fontenot had been found, shows that he had a telephone in China, listed to H. J. Fontenot. He had just recently moved to Beaumont but upon dialing the China number a recording would state his new Beaumont number.

We do not question the good faith of counsel's belief that he had made, or caused to be made, a diligent search for Fontenot. The record demonstrates, however, that he was clearly mistaken.

■ Fontenot was not an agent or an employee of the railroad. He was not a defendant in the case. The railroad had not "manifested its adoption or belief in the truth of his statement;" although it had called him as a witness in the previous trial. Obviously, this recorded testimony, even if otherwise admissible had Fontenot been present, could have been admissible only under Rule 804(a)(5) and then only if the plaintiff had been unable to procure his presence by process or other reasonable means, as the Rule requires.

Fontenot's statement concerned the crucial issue in the case. In the status of this record we cannot say that it was harmless. It necessarily follows that the presentation of the statement to the trial jury, as the trial judge anticipated, was reversible error. A new trial on the issue of liability, as well as damages, cannot be avoided.

REVERSED and REMANDED.

## APPENDIX A

*Recorded Testimony of H. J. Fontenot as Read to the Perricone Jury*

QUESTION: "Mr. Fontenot, for the record will you state your full name, please?"

ANSWER: "Harland James Fontenot."

QUESTION: "Okay. Where do you presently live, Mr. Fontenot?

ANSWER: "China."

QUESTION: "China, Texas. By whom are you presently employed?"

ANSWER: "By Bethlehem Steel."

QUESTION: "What sort of work do you do for Bethlehem?"

ANSWER: "I'm a shipfitter."

QUESTION: "Shipfitter. Who were you working for on August 22nd, 1973?"

ANSWER: "Beaumont Well Works."

QUESTION: "Beaumont Well Works. What kind of work were you doing for Beaumont Well Works?"

ANSWER: "Running a burning rig outside."

MR. ADAMS: I stopped on line 1 of page 157 of the Statement of Facts in that case.

I'll turn to page 163, and the question was, on line 20:

QUESTION: "Okay. Let me ask you about this crossing." This is about the Archie Street Crossing.

"Did you go across that crossing to and from work yourself?"

ANSWER: "Yes, sir."

QUESTION: "How would you characterize that crossing when you crossed it?"

ANSWER: "Well I'd characterize it going slow, because anything, I believe over five miles an hour, it ain't safe."

QUESTION: "You're going to have some trouble, right?"

ANSWER: "Yes, sir."

QUESTION: "All right. Now, let me ask you this: What about a car going over the crossing at, say five, six or seven miles an hour, should it have made it over there with no trouble from your experience in crossing that crossing?"

ANSWER: "Well, I've always crossed it slower. I mean, I would almost stop and go across it, and I'd say it depends on the shocks, or the car, and all that, how tough the car would be, I guess."

QUESTION: "But you do cross it, and you have crossed it every day coming to work?"

ANSWER: "Right."

QUESTION: "And you had crossed it and you hadn't hung up on any high rails at the crossing?"

ANSWER: "No. I went real slow, though, there."

QUESTION: "Yes, sir."

ANSWER: "I crossed it, I guess at two miles an hour. I just rolled across it."

MR. ADAMS: I stopped there on line 22 of page 164.

Picking up on page 167, at line 19:

QUESTION: "People that hadn't been over it, or weren't too familiar with it?"

ANSWER: "Yeah."

QUESTION: "Okay."

ANSWER: "Because you can go over that track once fast and you won't do it no more, or you hit your head on the ceiling."

QUESTION: "All right. What do you think the fastest a man could cross that track at?"

ANSWER: "I'd say safely at five miles an hour without maybe messing up your front end."

MR. ADAMS: I stopped on line 4 of page 168.

*Editor's Note: The opinion of the United States Court of Appeals, Fifth Circuit in *Gullatte v. Potts,* published in the advance sheets at this citation (630 F.2d 322), was withdrawn from bound volume at the request of the Court.