Vance and Augusta WILLIAMS

v.

MARTIN MARIETTA ALUMINA, INC., Appellant.

No. 86–3003.

United States Court of Appeals, Third Circuit.

Argued Dec. 4, 1986.

Decided April 29, 1987.

Rehearing and Rehearing En Banc Denied May 20, 1987.

Douglas L. Capdeville (argued), Law Offices of R. Eric Moore, Christiansted, St. Croix, U.S.V.I., for appellant.

Thomas Alkon (argued), Alkon and Rhea, Christiansted, St. Croix, U.S.V.I., for appellees.

Before SLOVITER, STAPLETON and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

### Facts

Martin Marietta Alumina, Inc. appeals from the denial of its motion for judgment n.o.v. or in the alternative for remittitur or a new trial following a $600,000 jury award in favor of Vance Williams for injuries suffered when he fell while working on the roof of a building on Martin Marietta's property. At the time of his injury, Vance Williams was working as a pipefitter for Riggers and Erectors (Riggers), an independent contractor hired by Martin Marietta to relocate an oil tank on Martin Marietta's property. Williams' job was to relocate oil lines on a building roof.

The roof of the substation on which Williams was working was of two heights because a structure had been added at the western part of the building in 1979. An air conditioning duct had been installed on the upper roof and a stationary ladder was permanently affixed to the west side of the building which provided access to the upper roof. There was no ladder giving access to the lower roof three feet below, which topped the remainder of the building. Williams' work site was on the west side of the lower roof, near the upper roof.

The parties gave conflicting stories concerning the events leading to Williams' fall. Williams testified that when he arrived at the work site the first time, he was with Felix Diaz, his Riggers' supervisor, and Sylvester Gonzales, Martin Marietta's project representative. According to Williams, they pointed out the pipes on the lower roof that were to be relocated and when he asked how to get to the lower roof, Gonzales told him "Follow me". App. at 74. Williams testified that Gonzales

then demonstrated how to gain access to the lower roof by climbing eight feet up the affixed ladder and then stepping from the ladder sideways onto a row of plasti-coated electrical conduit pipes which led to the lower roof. App. at 75.

Williams' testimony in this respect was unequivocal. Pointing to a diagram, he told the jury, "[Gonzales] took me up this ladder, come up the ladder, come across on these pipes, and onto this roof." App. at 75. In response to the question, "[D]id Mr. Gonzales go up on the roof with you?", he answered, "Yes, sir, he went up first and then Tito [Diaz] then me." Id. Williams' testimony was confirmed by that of Raphael Phillip, a Riggers welder, who said, "Judging by this ladder here, this was the way that Mr. Sylvester Gonzales and Tito Diaz went up to show us what he wanted done." Tr. at 93.

Williams testified that he used this method of access three to four times a day for the two weeks he worked there. App. at 84. According to Williams, Gonzales observed him working on the roof several times and never mentioned another way to obtain access. App. at 75.

Contrary testimony was given by Gonzales who testified that he did not instruct either Williams or Phillip how to gain access to the lower roof, App. at 170, and that he had no knowledge that Riggers' employees were using the ladder for access to the lower roof. App. at 174.

Williams injured his back when he fell eight feet when he was moving from the ladder to the conduit pipes while trying to gain access to the lower roof. Williams sued Martin Marietta, contending that it was negligent both because it failed to provide a safe access to the work area on the lower roof and because Gonzales instructed him to use an unsafe method for gaining access to the lower roof. Tr. at 10, 493–95. The district court instructed the jury that it could find Martin Marietta liable for Williams' injuries if it found that Martin Marietta selected the means of access to the work site and that Martin Marietta did not exercise reasonable care in selecting that means of access or if it

found that Williams' injury was caused by a condition on Martin Marietta's land that Martin Marietta knew of or by the exercise of reasonable care should have known posed an unreasonable risk to Williams as a business invitee. The court also told the jury that if Martin Marietta retained control over the manner in which the work was performed, it could find Martin Marietta liable for any injury to Williams caused by the negligence of Riggers. Tr. at 559–63.

The jury returned a general verdict in favor of Williams and awarded him $600,-000 in compensatory damages.

## II.

### *Liability*

### A.

### *Failure to Provide Safe Access to the Work Site*

Williams predicated his case on two theories of negligence, one being Martin Marietta's failure to provide him with a safe access to the work site and the other being the negligence of Gonzales, Martin Marietta's representative on the site, in directing access by an unsafe route. Williams' first theory is based on section 343 of the Restatement (Second) of Torts (1965), dealing with the "special liability of possessors of land to invitees," which provides:

§ 343. **Dangerous Conditions Known to or Discoverable by Possessor**

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

The district court instructed the jury on this theory as follows:

A possessor of land such as Martin Marietta is also subject to liability for physical harm caused to its business invitees such as Vance Williams, by a condition on the land if, but only if, the possessor, that is, Martin Marietta knows, or by the exercise of reasonable care would discover the condition and should realize that it involves an unreasonable risk of harm to such invitee, and should expect that the invitee will not discover or realize the danger or will fail to protect himself against that danger and that the possessor fails to exercise reasonable care to protect the invitee against the danger in question.

App. at 560–61.

■ Many jurisdictions hold that a possessor of land is not liable to the employees of an independent contractor for open and obvious dangers. *See* S. Speiser, C. Krause & A. Gans, The American Law of Torts § 14.12, at 916–17 (1986). However, in the Virgin Islands, in the absence of local laws to the contrary, the principles of the Restatement provide the rules of decision. 1 V.I.C. § 4. Section 343A of the Restatement (Second) of Torts permits imposition of liability even for known or obvious dangers when the possessor should anticipate the harm. Thus, the court instructed the jury as follows:

However, such a possessor of land as Martin Marietta is not liable to the invitee, Vance Williams, for physical harm caused to the invitee, by any action or condition on the land who's [sic] danger is known or obvious to the invitee unless the possessor should anticipate the harm despite such knowledge or obviousness.

App. at 561.

Martin Marietta does not argue that the district court did not correctly state the applicable law. Instead, it argues that the court should not have submitted this issue to the jury because it was not the legal possessor of the work site where Williams was injured, and therefore Martin Marietta had no duty to provide Williams, a business invitee, with a safe workplace. Martin Marietta relies for its argument primarily on two cases in which the possessor of land

was held not to be liable to the employee of an independent contractor injured at the workplace.

In *Fisher v. United States,* 441 F.2d 1288 (3d Cir.1971), an employee of a subcontractor was injured while working at the site of the construction of a dam on land owned by the United States. The government had contracted with a general contractor to construct the dam, and it in turn engaged a subcontractor who in turn engaged the subcontractor for whom the plaintiff worked to perform the structural steel work for the support of concrete for the dam. The plaintiff Fisher was injured when a wooden "spreader" used to hold apart a form for the concrete on which he was walking broke, causing him to fall. The district court imposed liability on the United States under section 318 of the Restatement which establishes the duty of a possessor of land to control the conduct of its licensees so as to prevent harm to third persons. We reversed because we held that there was insufficient evidence that the United States was in possession of the property at the time. We stated that under applicable Pennsylvania law the presence of a few government employees, such as an engineer with authority to require the contractor's compliance with a safety plan and two inspectors whose duties included seeing that work was done in accordance with specifications and enforcing safety regulations, at "the construction site of a large dam" was not evidence that the United States was in possession of the site. *Id.* at 1291–92.

In the second case, *Hader v. Coplay Cement Mfg. Co.,* 410 Pa. 139, 189 A.2d 271 (1963), also cited in *Fisher,* the injured plaintiff was the employee of an independent contractor who had been hired by the landowner, Coplay Cement, to install a stone crusher weighing two and a quarter million pounds in an open quarry and to erect a 50 foot high structure to house the crusher. Hader was injured while working on that structure. The Pennsylvania Court articulated the applicable rule as follows:

> An independent contractor is in possession of the necessary area occupied by the work contemplated under the contract and his responsibility replaces that of the owner who is, during the performance of the work by the contractor, out of possession and without control over the work or the premises.

410 Pa. at 151, 189 A.2d at 277, quoted in *Fisher,* 441 F.2d at 1292. The Court held that Coplay was not liable to the injured employee on the basis of ownership of the property because it was out of possession. The presence of the owner's employees at the site did not indicate otherwise, because they did not exercise any control over the work of installing the crusher.

Both *Fisher* and *Hader* are factually and legally distinguishable from this case. The employees in those cases were injured while working on structures which were built by the independent contractor, rather than on an access provided by the owner. Also, in those cases it was evident that the independent contractor's work had necessarily displaced the owner's possession. The government was not conducting operations at the still unconstructed dam in *Fisher* nor was Coplay Cement quarrying at the specific site at which the crusher was being installed.

■ In this case, Riggers' exclusive possession over the ladder access to the roof was far from clear. There was evidence, which the jury could have credited, that Martin Marietta electricians were working on the roof while this job was proceeding and that they even used the same ladder to get up there. App. at 97. In fact, Gonzales himself, the Martin Marietta project representative, did not deny that. App. at 461. He would not testify that Martin Marietta had relinquished all accesses to the roof once Riggers began working, instead responding "I can't answer that with a yes or a no." *Id.* The comments to section 343 nowhere suggest it is inapplicable if the possessor of land has turned over possession to an independent contractor. We need not decide that issue. Since it is not clear that Martin Marietta had relinquished possession of the access to the roof to Riggers, the court did not err in instructing the jury on liability under section 343.

■ Section 343 governs the duty of a possessor of land to insure that premises are safe for invitees. As applied to an employee of an independent contractor, section 343 is referred to as the " 'safe workplace' doctrine, under which one who contracts with an independent contractor has a duty to provide a safe workplace for the employees of the independent contractor." *Donovan v. General Motors*, 762 F.2d 701, 704 (8th Cir.1985).

■ There was evidence from which the jury could have found that the conditions of access to the lower roof via the stationary ladder were unsafe. Gordon Finch, plaintiff's consulting safety engineer witness, testified that there were two accesses from the stationary ladder to the lower roof. One was to climb the ladder to the upper roof, walk toward the lower roof and drop the three feet down to it. App. at 107–09. This was the method by which the Riggers' superintendent gained access to the lower roof. App. at 150–51. However, there was no ladder extension or other manner by which the climber could get off the ladder safely and prudently at the upper roof. App. at 107–09. The other access was the way Williams used, to go three quarters of the way up the ladder, move to the left on the conduit and then onto the lower level. There was no handrail across the conduit. Finch testified, "The problem with that conduit access is that ... these are PVC-coated pipes. Very round. Whether it is wet or dry, it is slippery. It is not a proper surface to be used for a passageway, or what is defined as an MSHA regulation it is not a bonifide [sic] travelway." App. at 109. Nonetheless, he testified that this method for reaching the lower roof, the one used by Williams, was safer than going to the higher roof and jumping down. App. at 110. Finch concluded that the access provided by the fixed ladder did not satisfy the applicable regulations under the Mine Safety and Health Act, and that it was not safe. App. at 251–57.

Martin Marietta introduced evidence that there were other places at the building where a ladder could have been placed. Williams testified that he believed that a ladder on the other side of the building would have either been in the way of a bulldozer or interfered with tank construction. App. at 90. The differing testimony as to the feasibility of another access thus presented an issue for resolution by the jury.

Martin Marietta argues that it had no duty to protect Williams from conditions at the work site because it contractually delegated that responsibility to Riggers. It points to various contract provisions under which Riggers was responsible for making inspections, furnishing equipment and materials, implementation and operation of its own safety program, and providing handrails and guardrails on all openside floors, decks and walkways with a fall potential of five feet or more. App. at 186–88. It also sent a memorandum to all contractors which stated that "each contractor at a Martin Marietta site is solely responsible for maintaining safe working conditions for its employees." App. at 180.

■ The one case it cites in support of the proposition that it can contractually delegate responsibility for a safe workplace to an independent contractor, *Maltais v. United States*, 546 F.Supp. 96, 100–01 (N.D.N.Y.1982), *aff'd*, 729 F.2d 1442 (2d Cir.1983), is inapposite. In *Maltais*, the court held that the United States government, which had delegated the primary safety responsibility to an independent contractor, could not be held liable for the negligence of the contractor or its subcontractor. The reason for the holding lay not in the fact of delegation but in the limited waiver of sovereign immunity under the Federal Tort Claims Act which was held not to cover that situation. We are unwilling to hold that as a matter of law a contract between an owner and independent contractor allocating responsibility between themselves for maintaining a safe premises may relieve the owner of liability to invitees for injuries sustained as a result of dangerous conditions known or discoverable by the owner. Instead, the contract was a factor along with others to be considered by the jury in assessing liability for

the allegedly dangerous condition of the workplace access turned over by Martin Marietta, and Martin Marietta presented the contract issue to the jury in that light. *See* Tr. at 515. In summary, the evidence raised questions of fact concerning the safety of the conditions of access, and Martin Marietta's duty with respect thereto. Resolution of the issue of liability on the basis of section 343 was for the jury. We reject Martin Marietta's contention that it could not be held liable under the section as a matter of law.

## B.

### *Negligent Directions of Martin Marietta's Employee*

█ The other theory of liability urged by Williams was based on the negligent directions for access given by Martin Marietta's employee, Gonzales.[1] As a general rule, employers of independent contractors are not vicariously "liable for physical harm caused to another by an act or omission of the contractor." Restatement (Second) of Torts § 409. However, the employer of a contractor may be liable to others for harm caused by its own negligence. *See* Restatement (Second) of Torts §§ 410–415.

Martin Marietta argues that its liability could not have been predicated on section 414 of the Restatement because that section imposes liability for negligence only on "[o]ne who entrusts work to an independent contractor, but who retains the control

1. The district court instructed the jury as follows:
   [O]ne who hires an independent contractor and undertakes to select the means of access by which the employees of said independent contractor are to reach the designated work site must, under the law, exercise reasonable care in selecting said means of access.
   Plaintiff Vance Williams has presented evidence tending to prove that defendant Martin Marietta acting through its agent, Mr. Sylvester Gonzales, selected the means of access to the work site in question. Defendant Martin Marietta, on the other hand, has presented evidence tending to prove that it did not select the means of access to the work site. That is, that the means of access was selected solely by Riggers and Erectors. The employer of

of any part of the work,"[2] and the evidence was uncontested that it did not, in fact, retain control over any part of the work.

However, it was Martin Marietta, not Williams, who proffered the section 414 instruction. *See* App. at 499. Assuming, as Martin Marietta argues, that Gonzales' instruction to "Follow me" and his demonstration of reaching the lower roof by using the ladder and conduit pipes do not demonstrate "control" within the meaning of section 414, *see, e.g., Rich v. United States Lines, Inc.,* 596 F.2d 541, 550 (3d Cir.1979) (shipowner not liable under § 414 for injury to longshoreman who fell from container covered with ice even though ship's officer directed which containers to load, discharge or shift), that would not warrant disturbing the jury verdict.

█ The judge's instructions to the jury were consistent with section 410 of the Restatement (Second) of Torts and the evidence was sufficient to sustain liability under that section. Section 410 provides:

**Contractor's Conduct in Obedience to Employer's Directions**
The employer of an independent contractor is subject to the same liability for physical harm caused by an act or omission committed by the contractor pursuant to orders or directions negligently given by the employer, as though the act or omission were that of the employer himself.

Williams through its employees, the supervisors of Williams.
   If you find that Martin Marietta selected the means of access, then you must determine whether Martin Marietta exercised reasonable care in selecting that means of access. App. at 541.

2. Section 414 of the Restatement (Second) of Torts provides:
   **Negligence in Exercising Control Retained by Employer**
   One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Under section 410, the employer of an independent contractor is liable for harm caused when the employer instructs the independent contractor to do work which in itself or as ordered to be done is unreasonably dangerous. We have previously stated that this section applies when an employee of the independent contractor is injured. *Draper v. Airco, Inc.*, 580 F.2d 91, 101–02 (3d Cir.1978). We relied on *Gonzalez v. United States Steel Corp.*, 248 Pa. Super. 95, 102–05, 374 A.2d 1334, 1338–39 (1977), *aff'd*, 484 Pa. 277, 287–88, 398 A.2d 1378, 1383–84 (1979), where the Pennsylvania Superior Court held that an employer of an independent contractor could be liable under section 410 to the employee of an independent contractor injured by the collapse of bricks where the employer instructed the contractor to remove bricks from a wall.

■ Williams testified that Gonzales, the Martin Marietta representative, demonstrated use of the ladder and conduit pipes as the method for reaching the lower roof. App. at 74–75. Williams' co-worker testified that Gonzales and Diaz, the Riggers' supervisor, demonstrated using the ladder and conduit pipes. App. at 102. Although Gonzales testified that he did not instruct either Williams or Phillip to use this method of reaching the lower roof, as the district court instructed the jury, the issue "boils down ... to a matter of credibility." Tr. at 563. The jury apparently found the testimony of Williams and his co-worker credible. We see no reason to disturb the jury's finding.

In reviewing the district court's decision on a motion for judgment n.o.v. we must apply the same standard as did the district court in reviewing the motion. *Smollett v. Skayting Development Corp.*, 793 F.2d 547, 548 (3d Cir.1986). That is, we must determine whether "as a matter of law, the record contains the 'minimum quantum of evidence from which a jury might reasonably afford relief.'" *Id.* (citation omitted). As the Supreme Court stated in *Lavender*

*v. Kurn,* 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946), in reviewing a jury verdict, "[o]nly when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear." Reviewing the record in the light most favorable to the holder of the jury verdict, we cannot conclude that the district court erred in denying Martin Marietta's motion for judgment n.o.v.[3]

### III.

#### *Damages*

Martin Marietta argues that the award of $600,000 was not rationally based on the evidence produced at trial and that the district court erred in not ordering a remittitur or in the alternative a new trial.

Williams was 38 years old at the time of the accident. He had been a pipefitter for four years. App. at 82. His claim of economic loss was based on diminution of earning capacity. Williams did not contend that he could no longer work in any job, but that he could no longer work as a pipefitter or in the type of manual labor that he had performed, which paid more than the jobs that he would be able to perform. In support of that contention, he introduced the testimony of Stuart Mudge, the personnel manager of Riggers who kept the pay records of Riggers' employees and who testified that at the time of the accident in May of 1983, Williams was an A class pipefitter, made an hourly wage of $9.26, and was working a 40–hour week. App. at 115–16. He also testified that a person with that classification made $10.33 hourly at the time of trial. *Id.*

Williams then introduced the testimony of James Watson, a vocational rehabilitation counselor, who testified that Williams lost at least 40% of his earning capacity as a result of his injury. Tr. at 210. Watson based his conclusion on the lower pay for the type of work available to Williams in, for example, manufacturing of durable

---

**3.** The dissent suggests that Williams assumed the risk of falling when he used the access directed by Gonzales. Martin Marietta raised assumption of risk at trial, but the district court declined to give its proffered instruction to the jury. Martin Marietta has not raised that issue on appeal, and hence it is not before us.

goods, as contrasted with the physically demanding work in an oil refinery or construction project which he assumed Williams could no longer perform. *Id.* Finally, Williams' economic expert, Professor Laurence Roberts formerly of the University of Tampa, testified that based on the 1985 salary for pipefitters, an assumed 8% annual wage increase, and twenty-five years' earning capacity, the present value at the time of trial of Williams' lost earning capacity would be $244,518. App. at 133–34. He also testified that Williams had lost $38,520 in the two years since the accident when he had been fully unemployed. App. at 135.

■ Martin Marietta objects to the method used in computing the lost earnings, arguing that Williams' economic expert improperly assumed that Williams normally worked a 40–hour week. Also, it contends that plaintiff was obliged to provide proof of corroboration of earning history such as by income tax returns, citing *Connally v. Chardon,* No. 78–52 (D.V.I. Aug. 4, 1978). Although under *Chardon* plaintiff's self-serving statements may not be enough to support an award of lost income, in this case plaintiff introduced sufficient corroborating evidence in the form of testimony based on the employer's pay records. *See Varlack v. SWC Caribbean, Inc.,* 550 F.2d 171, 178 (3d Cir.1977) (testimony of employer sufficient to support damage award based on full employment throughout plaintiff's projected working life).

■ Martin Marietta argues in its brief that "pipefitting jobs are cyclical in nature and not permanent." Appellant's Brief at 37. However, Martin Marietta introduced no evidence on this issue and, significantly, even failed to cross-examine Riggers' personnel manager or Williams as to the number of weeks that Williams worked each year. If there had been evidence that Williams, or pipefitters in general, worked less than the full time projected by Williams' witnesses, the portion of the damage verdict reflecting economic loss might indeed be excessive. Martin Marietta apparently made a decision not to inquire further on this issue. In the absence of any evidence to the contrary, the jury was entitled to infer that Mudge's testimony about Williams' weekly hours applied throughout the year. The maximum sought by Williams for economic loss was $283,038. Although we view that as extremely generous, we cannot say that it is not supported by the record.

Martin Marietta also argues that the verdict was not reasonable, apparently asking us to hold that the injury was not as serious as Williams claims. To emphasize the minor nature of Williams' physical injury Martin Marietta points out that Williams did not sustain a herniated or bulging disk, was never hospitalized for his injuries, and did not incur substantial medical expenses.

In *Walters v. Mintec/International,* 758 F.2d 73, 80 (3d Cir.1985), we reiterated the general principle that the scope of this court's review of a damage award is "exceedingly narrow". We may grant a new trial or a remittitur " 'only if the verdict is "so grossly excessive as to shock the judicial conscience." ' " *Id.* (citations omitted). It is not a sufficient basis to reverse if we find only that an award is extremely generous, *id.* (citation omitted), or that had we been deciding, we " 'would have found the damages to be considerably less.' " *Id.* (citation omitted).

On the other hand, we have not shirked our responsibility to review a damage award to determine if it is rationally based. For example, in the *Walters* case we recognized that "[e]vidence of pain and suffering is particularly ill-suited to review upon only a written record," 758 F.2d at 81 (citing *Edynak v. Atlantic Shipping Inc. C.I.E. Chambon Maclovia S.A.,* 562 F.2d 215, 227 n. 16 (3d Cir.1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978)), but we nonetheless vacated the wrongful death awards for pain and suffering to two children of the decedent. We held that because the children had minimal contact with their deceased father and had not seen him for a number of years, and "the evidence of present pain and suffering [is], at best, minimal," the award of $250,000 to each child extended "beyond all reasonable bounds." 758 F.2d at 81–82. We granted

a new trial unless the children elected to file a remittitur of each of their damages in excess of $25,000.

Thus, since we have already held that there is a basis in the record to support a finding of economic loss of $283,038, the question before us is whether we find shocking the total award of $600,000 in damages to Williams, of which approximately $317,000 must necessarily be for his pain and suffering.

Immediately after his fall, Williams was removed to a Martin Marietta first aid station and then to a local hospital. He was discharged after examination and required no hospital care. Tr. at 43–44. Most of the doctors he sought out thereafter saw him only once. Tr. at 76. No surgery was ever performed, none was advised, and no myelograms required. X-rays revealed no fractures in the pelvis, vertebral axis, or coccyx. App. at 160. A CAT (computerized axial tomography) scan taken precisely one year after the accident showed no direct or indirect evidence of intervertebral disc herniation or spinal abnormalities. App. at 429. No objective signs of neurological deficiencies or active radiculopathy were found. Tr. at 352. Dr. Lopez, who examined Williams in April 1984, informed him that he was totally recovered, without any neurological or muscular residual. Tr. at 353.

Several weeks after the accident, Dr. Mercedes Stefani, a physiatrist, examined Williams and thought there was a radiculopathy—a lesion of the root of the nerve—at the L5–S1 level. App. at 312. She prescribed the wearing of a corset which Williams testified he still wears for a half day. Tr. at 45, 53. Dr. Sylvia Payne, also a physiatrist, had a similar impression after performing electromyographic studies in September 1984. App. at 338–40. However, Dr. Rafael Longo, a neurologist, who examined Williams in August 1983, made no diagnostic finding of any radiculopathy. Tr. at 351–52. He characterized as questionable the impressions of the two physiatrists and attributed the minimal narrowing of the L5–S1 interspace to "preexisting relatively long-standing degenerative changes, not unusually seen in a 39 year old man who has been doing heavy work, such as pipefitting for many years." App. at 345. Dr. Payne agreed with that observation. App. at 345–46.

Two neurosurgeons who examined Williams in 1984 at the instance of the Department of Labor for Workmen's Compensation purposes concluded that he had recovered from the injury. Dr. Lopez reported, "[t]here is no clinical evidence of a neurologic impairment [or] radiculopathy or herniated disk lesion." Tr. at 352. Dr. Mojica found no objective neurological deficit but found back pain due to muscle contraction. He suggested that Williams return to work but avoid bending, heavy lifting, and positional stress. App. at 316.

Dr. Guzman Acosta also saw Williams on February 25, 1985, at the instance of Martin Marietta. He described finding a "relatively fixed, long-standing, rotoscoliotic deformity involving the dorsolumbar spine." App. at 316. He also reported radiculopathies at S1 and L5, which he described as "certainly not a surprising electronic finding in a 40–year-old male with a long-standing dorsolumbar rotary scoliosis and a congenital three-quarters of an inch shortening in the right lower extremity." *Id.*

Dr. Payne, Williams' witness, interpreted Dr. Lopez's report of no clinical evidence of neurologic impairment, radiculopathy, or herniated disk lesion as meaning that Dr. Lopez found that Williams' reflexes are normal, he had no sensory finding, and he had normal strength. Tr. at 247. Dr. Payne testified "I think [Williams] had a symptom related to S1 and he was treated and he got better." *Id.* However, she maintained that Williams still had a sprained muscle, although she too agreed that there were no objective signs of neurological deficits or active radiculopathy. *Id.* She believed that he could return to work, but not as a pipefitter. Tr. at 248.

Although the plaintiff complained of sexual dysfunction, none of the doctors prescribed any medication for him and the jury made no award for loss of consortium. The only medication he was on at trial time

was Flexeril, a muscle relaxant, prescribed by Dr. Henry and Dr. Pederson. Tr. at 78.

Williams' own testimony concerning the extent of his injury is significant. Williams testified that he still has pain in his lower back, App. at 202, that it hurts if he stands up and stretches and if he walks for any distance or sits for a long period of time. Tr. at 48–49. He testified he cannot sit through a whole movie, App. at 205, and can no longer dance. App. at 206. However, Williams also testified that he is able to walk up to 45 minutes before he becomes tired, Tr. at 79, he does exercise for his back including sit-ups, and he lives on the third floor and walks up and down the stairs. App. at 204. None of the doctors who examined Williams found him disabled or unable to work. His greatest physical limitation is that he has been instructed not to lift anything weighing more than twenty pounds. App. at 48.

On the basis of this record, we conclude that the award of the jury of more than $300,000 for pain and suffering was excessive. Our holding is consistent with the decisions of this court and other circuits in cases involving awards for pain and suffering for physical injuries. In *Kazan v. Wolinski*, 721 F.2d 911, 913–15 (3d Cir.1983), we approved a district court's order of remittitur of $90,000 where the jury awarded $150,000 for injuries to plaintiff's neck and arm. Although there was evidence that the automobile accident in which the plaintiff was involved caused a cervical sprain to the plaintiff's neck and a surgically correctable injury to his arm, as well as testimony that the neck injury would be permanent, we stated, "The neck and arm injury alone would not have been sufficient ... to sustain an award of $150,-000." *Id.* at 914.

In *O'Gee v. Dobbs Houses, Inc.*, 570 F.2d 1084 (2d Cir.1978), a twenty-three year old plaintiff underwent back surgery which left scars, was unable to work for fourteen months, lost $10,000 in wages, returned to a less prestigious position, and was left with numbness and pain requiring medication. Her activities were limited and her gardening was eliminated. The Second Cir-

cuit reduced the $170,000 award granted by the district court to $85,000. *Id.* at 1090.

An award of $170,000 to a railroad worker who was injured was held to be "grossly excessive." *Perricone v. Kansas City Southern Railway Co.*, 630 F.2d 317, 320 (5th Cir.1980). The plaintiff had sustained an earnings loss of $4,000, lost 30 percent of the motion in his neck, sustained substantial damage to his teeth, and suffered occasional periods of discomfort from whiplash. *Id.* at 319.

Likewise, a 24 year old plaintiff in *Ferrero v. United States*, 603 F.2d 510, 513–14 (5th Cir.1979), struck by an automobile sustained a compression fracture of the first lumbar vertebra, an abrasion and severe sprain of the left ankle, and a hematoma of the scalp. Doctors agreed that it was probable that she would experience arthritic changes around the fracture site. Plaintiff had a constant pain in her back and sustained an injury to her knee which caused her to experience pain after standing for fifteen to thirty minutes. Nonetheless, the Fifth Circuit reduced the damage award from $650,000 to $150,000. *Id.* at 515–16.

In *Howell v. Marmpegaso Compania Naviera, S.A.*, 536 F.2d 1032, 1034 (5th Cir.1976), a case in wich the plaintiff suffered injuries not dissimilar but more serious than Williams' injury, the Fifth Circuit found a damage award of $136,000 for pain and suffering and loss of earning capacity to be "simply not in the universe of rational awards." The plaintiff in *Howell* suffered a defective intervertebral disc which required surgery. The plaintiff continued to experience pain and although he was able to return to work, he could no longer perform such activities as gardening, playing ball with his children and dancing. *Id.*

Similar results have been reached in other cases. *See, e.g., Harper v. Zapata Off-Shore Co.*, 741 F.2d 87, 91–93 (5th Cir.1984) (holding award of $485,000 for pain and suffering excessive where injured plaintiff underwent two back operations and continued to live with some pain); *Bullard v. Central Vermont Railway, Inc.*, 565 F.2d 193, 196–98 (1st Cir.1977) (holding $35,000 award to railway worker who injured foot

when jumping from train to escape a collision was grossly excessive); *Laaperi v. Sears, Roebuck & Co., Inc.,* 787 F.2d 726, 735–36 (1st Cir.1986) (holding $750,000 award to plaintiff who suffered first and second degree burns over 12 percent of her body but who had largely recovered "so grossly disproportionate to [her injuries] as to be unconscionable"); *Shaw v. United States,* 741 F.2d 1202, 1209–10 (9th Cir. 1984) (reducing award for loss of child's love and companionship and injury to the parent-child relationship to parents of child with profound mental and physical retardation caused by defendant's negligence from $2,000,000 to $50,000).

We do not suggest that we necessarily agree with the disposition of each of the above cases. Rather, they represent an increasing appellate trend to review the merits of a damage award, even though the scope of our review is limited. Where, as in this case, the award is grossly excessive in relation to a plaintiffs injury, the award will not be permitted to stand. An award in this case in excess of $100,000 for Williams' pain and suffering extends beyond reasonable grounds.

### IV.

#### *Conclusion*

For the foregoing reasons, we will affirm the district court's order denying Martin Marietta's motion for a judgment n.o.v. However, the judgment will be vacated and the case remanded to the district court for a new trial on the issue of damages unless Williams elects to file a remittitur of the damages in excess of $383,038, since that is the maximum amount of damages that we find supported by the record. Each party to bear its own costs.

ROSENN, Circuit Judge, dissenting.

Viewing the record in the light most favorable to the plaintiff and giving his evidence the benefit of all legitimate inferences which may be drawn from it, I am unable to discover any evidence to establish liability on the part of the defendant, Martin Marietta Alumina, Inc. (Martin Marietta). When the facts are such that only one

conclusion can be drawn under the applicable law, it is the duty of the court to decide the question as a matter of law, and not submit it to a jury. *Thomas v. E.J. Korvette, Inc.,* 476 F.2d 471, 474 (3d Cir.1973) (citing 5A Moore's Federal Practice ¶ 50.-07[2] ). I therefore believe the district court erred in failing to grant the defendant's motion for judgment notwithstanding the verdict. Hence, I respectfully dissent.

### I.

Some background facts that are undisputed provide helpful perspective in fixing the duties of the parties and their relationship to each other on this appeal. Martin Marietta entered into a written contract with Arlen Building Corporation (Arlen) on March 10, 1983, for extensive construction at its plant in St. Croix, Virgin Islands. Williams, the plaintiff, was employed by Riggers and Erectors (R & E), apparently a division of Arlen. Work commenced on the project in March 1983, several months before Williams' fall. By the time construction commenced, the contractor had familiarized itself with the site, the drawings, and the scope of the work.

A relatively small portion of the work which Arlen had contracted to do included the relocation of four one-half inch oil lines for filling a tank. This apparently required Williams to work on the roof of a small building identified as a substation. The roof, frequently referred to as the lower roof, is about eight feet above the ground, and has no permanent ladder affixed to it for access; there is nothing on the roof that customarily requires maintenance. Adjacent to the substation, the defendant constructed an addition in 1979 which had a higher roof (upper roof), and to which is affixed a metal ladder allowing access for maintenance of air conditioning equipment located thereon. This ladder is located several feet away from the original substation.

Even prior to the general bidding on the construction project by contractors, Martin Marietta sent a memorandum to potential contractors stressing the importance of the safety of all employees in the work to be

performed on the project and the contractors' sole responsibility for assuring a safe working place for their employees on the site. Martin Marietta reserved the right to spot check to bring any violation to the contractor's attention for appropriate corrective action.[1] When the parties later executed the formal document, the contract required that the contractor would provide the necessary supervision and equipment for the construction, including tools and scaffolding. The contractor also agreed to supply "such safety devices as are normally standard ... and to exercise usual and ordinary care in the performance of erection work on Martin Marietta's premises." The contractor further represented in the agreement that it had "full opportunity to inspect and investigate the site of the work and that it accepts full responsibility for all phases of the work and any and all conditions which may affect the progress of the work, including ... the site of the work ... and any patent or latent conditions which may affect the performance of the work...." R & E had the responsibility to provide and maintain handrails and/or guardrails on all open side floors, decks, and walkways with a drop of five or more feet, and had the duty to furnish, erect and install all structural steel items including stairs, ladders, walkways, platforms, and handrails. It was also the contractor's responsibility to perform the work in compliance with federal laws and regulations, including safety laws, and to submit its own safety plan to Martin Marietta. Finally, the contractor had the responsibility to take all precautions to protect against all injuries, including accident prevention, and to continually inspect the work and supervise its employees to determine and enforce compliance with the contract provisions.

On the day of Williams' fall, he had been working, according to his testimony, on some of the pipelines in the relocation of oil tanks from one section of the plant to another. His supervisor, Diaz, to whom he familiarly referred as "Tito," instructed him to stop his work and to go on to the next section. He therefore had to go back on the roof of the substation to "tie the pipes off," or secure them. He testified that he mounted the metal ladder partway, and then stepped across some conduit pipes carrying electrical wires to walk to the substation roof. The conduit pipes, six in number, ran parallel to the substation roof, and, according to photographs, appear to have been at least one foot below the roof. They were several inches in diameter, plastic coated, and, again according to photographs, appear to have varied from about one to three inches apart. When Williams stepped across "from the ladder to the pipe—conduit pipe, ... [he testified] I lost my balance and fell" the approximately seven to eight feet to the pavement.

## II.

The plaintiff tried his case on the theory that despite the carefully drawn contractual provisions imposing sole responsibility for safety of its employees at the project on the contractor, all of the contractual provisions were nullified because eleven days before the accident Gonzales, Martin Marietta's construction superintendent, showed Williams an unsafe access route to the substation roof. Williams theorized that as a result of Gonzales' actions Martin Marietta assumed a continuing duty to Williams which would later subject Martin Marietta to liability.

Williams testified that Diaz first took him out to the substation along with Gonzales on May 5, where the two explained to him what had to be done. Williams then inquired, "How am I going to get up there?

1. With regard to safety, the memo stated, in relevant part:

Martin Marietta considers the safety of all workers at its plant sites to be of the highest priority. Contract safety procedures will be checked on a spot basis, but it must be stressed that each contractor at a Martin Marietta site is solely responsible for maintaining safe working conditions for its employees.

\* \* \* \* \* \*

Contractors shall stress to their employees that safety is a high priority and shall enforce safety requirements with their employees. Workers who refuse to comply shall be disciplined.

Gonzales said, 'Follow me,' and Tito, Mr. Gonzales, and myself went to where to get up to the work area." Williams then testified that Gonzales proceeded up the metal ladder, and across the conduits to the lower roof, followed first by Tito and then himself. This was the same route he used when he fell eleven days later.

Although Gonzales denied having any conversation with Williams with respect to access to the substation,[2] we assume for the purposes of the motion for judgment notwithstanding the verdict and this appeal that such a conversation occurred. Williams' alleged inquiry on how to get up on a *flat roof merely eight feet above the ground*, coming from a skilled pipefitter in the construction business and employed by an independent contractor, cannot reasonably be construed as a selection by Martin Marietta of the mandatory means of access to the work site. At most, it was a gratuitous demonstration of how one could reach the roof. The district court, however, flatly instructed the jury:

> [O]ne who hires an independent contractor and undertakes to select the means of access by which the employees of said independent contractor are to reach the designated work site must, under the law, exercise reasonable care in selecting said means of access.
>
> Plaintiff Vance Williams has presented evidence tending to prove that the defendant Martin Marietta acting through its agent, Mr. Sylvester Gonzales, selected the means of access to the work site in question.

Williams, however, conceded on cross-examination that the Martin Marietta people never gave him directions. "They never tell us how to do the job."[3] He admits that he never had any discussions with anyone from Martin Marietta regarding his work, and he took no instructions, advice, orders, or anything in that nature from Martin Marietta, but only from Diaz. Raymond Willard, R & E's superintendent on the job, confirmed that Martin Marietta employees exercised no control over the manner in which R & E employees were working. Under such circumstances, and with his clear understanding that he took all of his orders from his R & E supervisor, Diaz, Williams could in no way have understood Gonzales' illustration on how to reach the roof as an order or direction to use the metal ladder and to walk over the conduit pipes to reach the roof.[4]

Had Williams fallen on his first trip to the roof, plaintiff might have established a case for liability on the theory that Gonzales' response to Williams' inquiry, although not a direction, misled him to take a dangerous route to the substation roof. But Williams did not fall on May 5. He admittedly made the passage up and down the metal ladder and across the conduit three to four times per day during the six days he worked through May 16, or at least twenty-four times before the accident. After his first journey to the roof, Williams knew it was dangerous. Thus, he cannot be heard to say, as he did at trial, that *he* saw nothing wrong with the route but that *Martin Marietta* negligently provided him with dangerous access to his work site.

---

**2.** Gonzales denied having any conversation with Williams with respect to access to the roof. Gonzales testified that the metal ladder did not go "to an area where the contractor had to work." Although seldom used, its purpose was to gain access to the upper roof to service the air conditioning equipment. He did not know contractor employees were using it to gain access to the lower roof. Martin Marietta had nothing to be maintained on the lower roof and no ladder for access to it.

**3.** Williams further testified:

Q: And your dealing was strictly with Tito Diaz, the Riggers and Erectors supervisor?
A: Yes.

Q: And you spoke to Tito Diaz and he told you what to do, and if you had any complaints and you spoke to Tito?
A: Yes.
Q: You never had any complaint about the work site?
A: No, sir.
Q: You never once asked Mr. Diaz to get a ladder or scaffold to get you up there where you were supposed to work?
A: No, sir.

**4.** Walking over the conduits violated Martin Marietta policy. Willard, R & E's superintendent, acknowledged "you are not supposed to walk on conduits."

*See Frasca v. Prudential Grace Lines, Inc.,* 394 F.Supp. 1092, 1099–1102 (D.Md. 1975) (although shipowner might have been liable for injuries sustained during longshoremen's first descent down hatch, "reasonable minds could not differ concerning the unforeseeability that, even though the condition became worse during the day, the longshoremen would continue to go in and out of the hold on at least 25–30 separate occasions without even protecting themselves by ... the use of a safer, alternate route,....").

Williams' expertise was in construction; as part of his duties with R & E he was accustomed to getting to "some difficult places." The ladder-conduit route, however, was obviously dangerous. Indeed, Williams produced an expert witness at trial, Finch, a consulting engineer, who testified that the problem with the conduit access to the roof was that "these are plastic coated pipes. Very round. It is not a proper surface to be used for a passageway. A bonafied [sic] travelway would have had a bonified [sic] legitimate walking surface as well as rails to hold onto to the work site."

Williams obviously was not a novice around construction work. As an experienced pipefitter, he knew or should have known the dangers in walking on elevated, round, plastic coated, slippery pipes. By virtue of his training and experience with pipework, he was more sensitive to the danger than the property owner. He could not continue to walk over these pipes day in and day out, three and four times a day, and eleven days later shift responsibility by claiming there was no other access route to

the eight foot roof. In fact, there was another means of access to the roof. Willard, R & E's superintendent, testified that he used a different and safe way to the roof. He testified that R & E had provided movable ladders to enable its workmen to gain access to the roof, and that R & E had the responsibility for providing access and equipment to get its men to the work site. Indeed, Williams himself conceded that there were many areas around the structure where one could put a ladder.[5] Under these circumstances, there can be no duty on the part of Martin Marietta to protect against a danger that was glaringly obvious to anyone, and to Williams in particular.[6]

Although we must indulge in the presumption that Williams' testimony concerning his cursory conversation with Gonzales is true and give Williams the benefit of every reasonable favorable inference to be drawn from all the evidence, these rules do not require us to "disregard the dictates of common reason and to accept as correct or true that which obviously under all the circumstances in evidence cannot be correct or true; nor to give plaintiff the benefit of any other than reasonable inferences.... The plaintiff is bound by his own testimony; may not have the benefit of or resort to the support of evidence inconsistent with such testimony, and conceded facts may not be disregarded." *Larrea v. Ozark Water Ski Thrill Show, Inc.,* 562 S.W.2d 790, 792 (Mo.App.1978) (quoting *Levin v. Sears, Roebuck & Co.,* 535 S.W.2d 525, 527 (Mo. App.1976)).

The owner of property who engages an independent contractor to restructure a

---

5. Williams testified:
   Q: After being out to the plant since then, do you agree that there are lots of other ways you could have gotten up to the roof?
   A: There are other ways.
   Q: Have you ever asked Mr. Tito Diaz for a ladder to get up on the other side?
   A: No, sir.
   Q: Did you ever ask for a cherry picker?
   A: No, sir.
   Q: Did you think about using scaffolding?
   A: Where I had to run the pipes for relocation, it would have been difficult to put scaffolding there.
   \* \* \* \* \* \*

Q: Have you ever asked for a ladder or any equipment so you wouldn't have to go up on this ladder?
A: No, sir. I asked Mr. Gonzales how to get up on the roof and he showed me that way and I used that way.

6. Contrary to the suggestion of the majority, maj. op. 17 n. 3, I do *not* conclude that liability is precluded by Williams' "assumption of the risk." Rather, as the cited cases *infra* demonstrate, my conclusion is that Martin Marietta can have no duty to protect against a danger that is plainly obvious.

plant for him is not an insurer of the safety of the employees of the contractor and cannot be held liable for an injury resulting from a danger which was obvious or which should have been observed in the exercise of ordinary care. *Elder v. Pacific Tel. & Tel. Co.*, 66 Cal.App.3d 638, 136 Cal.Rptr. 203, 208 (1977). Even if Gonzales showed Williams a dangerous route to the roof, Williams, had he been concerned, had other alternatives.[7] I do not agree with the majority that the feasibility of alternative means of access presented "an issue for resolution to the jury." Maj. op. at 11. The owner of property, especially an industrial plant under alteration or reconstruction, is under *no duty to reconstruct* the premises so as to obviate known and obvious dangers. *Hokanson v. Joplin Rendering Co.*, 509 S.W.2d 107, 111 (Mo.1974). "In determining the extent of preparation which an invitee is entitled to expect to be made for his protection, the nature of the land and the purposes for which it is used are of great importance." Restatement (Second) of Torts § 343 comment 3 (1965). Workmen engaged in plant reconstruction must assume all normal, obvious, or ordinary risks accompanying the use of the premises:

> The duty to provide a reasonably safe place in which to work is relative to the nature of the invited endeavor and does not entail the elimination of potential operational hazards which are obvious and visible to the invitee upon ordinary observation.... This is especially so when the invitee is an experienced laborer hired either to correct the very danger present or to perform his tasks amidst the visible hazards. The landowner may assume that the worker, or his superiors, are possessed of sufficient skill to recognize the degree of danger involved and to adjust their methods of work accordingly. Thus the unimpaired line of holdings to the effect that the duty to provide a reasonably safe working place for employees of an independent contractor does not relate to known hazards which

are part of or incidental to the very work the contractor was hired to perform. *Wolczak v. National Elec. Prods. Corp.*, 66 N.J.Super. 64, 168 A.2d 412 (1961) (citations omitted).

Under section 343A of the Restatement (Second) of Torts dealing with known or obvious dangers, "a possessor of land" is *not* liable to his invitees for physical harm caused to them by any activity or condition on the land *whose danger is known or obvious to them,* unless the possessor should anticipate the harm despite such knowledge or obviousness. We do not have here a situation where the invitee is a patron of a store, hotel, theater, or office building who is entitled to expect that the owner of the property will have made far greater preparation to secure the safety of invitees than will have been made by the owner of an industrial plant about to undergo alteration by the invitees. We have before us commercial construction where the contractor and his employees expect certain risks and are prepared to cope with them. Martin Marietta had no reason, despite the alleged conversation between Gonzales and Williams on May 5, to anticipate any harm to Williams in gaining access to the roof. If the means of access shown by Gonzales was dangerous, Williams had ample opportunity to know of it and to take corrective action. Williams was clearly in the best position—at least as of his twenty-fourth trip over the pipes—to anticipate and protect himself against the obvious danger posed.

Courts have frequently reversed judgments entered for invitee plaintiffs where the danger to them was obvious. For example, in *Gowdy v. United States*, 412 F.2d 525 (6th Cir.1969), the Sixth Circuit reversed a judgment of the district court in plaintiff's favor and remanded with instructions to dismiss the complaint where the plaintiff, the employee of an independent contractor, fell from the roof of a lighthouse which did not have guardrails. According to the court:

7. Williams admitted that he never told his R & E supervisor that he would rather have a different means of access. It never occurred to him

that there was something wrong in getting to the roof that way.

Since the Government may not be held liable without fault, it follows that the only basis for liability is negligence, if any, of government employees in failing to warn Gowdy of the danger or in failing to provide guardrails to prevent the fall. But the government was not required to warn Gowdy of something which he admitted that he already knew, namely, that no guardrail was on the flat roof and that it was dangerous for him to work too close to the edge of the roof because he might lose his balance and fall. Neither was the Government, under such circumstances, required to provide a guardrail. Thus we hold that the Government, as the owner of this flat roof, could not have anticipated that a reasonably careful workman would not protect himself from the known and obvious danger here involved.

*Id.* at 535. Similarly in this case, Martin Marietta was not required to inform Williams that a ladder was safer than negotiating the conduits, because after more than twenty-four trips to the roof even a layman—let alone an expert with four years experience—would be aware of the danger. *See Frasca v. Prudential Grace Lines, Inc.,* 394 F.Supp. 1092, 1099–1102 (D.Md.1975) (granting judgment n.o.v. where obviousness of grease and oil on ladder's rungs relieved shipowner of duty to longshoreman: "Clearly, if the accident had occurred in the early morning upon the first descent down the hatch, a jury could find the shipowner liable ... [but] reasonable minds could not differ concerning the unforeseeability that, even though the condition became worse during the day, the longshoremen would continue to go in and out of the hold on at least 25–30 separate occasions without even protecting themselves by ... the use of a safer, alternate route,....").

Again, in *Hokanson v. Joplin Rendering Co.,* 509 S.W.2d 107 (Mo.1974), the court considered the claim of a plaintiff who was employed by an independent contractor engaged to install a rendering machine in the defendant's plant. The plaintiff lost his left hand in rotating machinery after the base of his ladder slipped out from under him. Both the floor and the base of the ladder—as well as almost everything else in the plant—was inordinantly greasy. Nevertheless, after looking to sections 343 and 343A of the Restatement (Second) of Torts, the court disregarded the jury's verdict, reversed the trial court, and remanded with instructions to enter a directed verdict for the defendant, stating:

[W]e declare *as a matter of law* that there was no duty resting upon defendant to exercise reasonable care to protect plaintiff against danger, for the reason that there is no evidence of superior knowledge by defendant of the allegedly dangerous condition of the premises or the appliance. On the contary, there is an abundance of evidence, including plaintiff's personal testimony, demonstrating beyond any possibility of difference of opinion on the question, that the dangers involved were open, obvious and apparent for all to see and that plaintiff's personal knowledge and realization of the risk of harm was equal to (if not greater than) that attributable to defendant.

*Id.* at 110–11 (emphasis added).

In *Laaker v. Hartman,* 186 Neb. 774, 186 N.W.2d 494 (1971), the court set aside the plaintiff's verdict upon a motion for judgment notwithstanding the verdict. The plaintiff, an independent subcontractor, sued to recover for injuries sustained as a result of a fall from a ladder in a house under construction. The plaintiff fell while carrying scrap material from the second floor down a ladder which, on the third or fourth trip down, tipped to one side. In affirming the judgment notwithstanding the verdict the Nebraska Supreme Court observed that the absence of temporary stairs and the use of the ladder were apparent. The plaintiff was very familiar with ladders, their usage, and their failings, and the attendant hazards were open and obvious. "We are unable to ascertain wherein the defendant was guilty of any negligence. To the contrary, it appears that any negligence attendant upon the accident was necessarily that of the plaintiff." *Id.* at 496.

Because over a period of eleven days Williams traversed at least twenty-four times a path which presented a plainly obvious danger, Martin Marietta cannot legally be held liable for breaching any duty it owed to him. It was therefore error for the district court not to declare as a matter of law that the plaintiff had not established any liability on the part of Martin Marietta. Accordingly, the judgment of the district court should be reversed and the cause remanded with directions to set aside the verdict and judgment and enter judgment for the defendant in accordance with its motion for a judgment notwithstanding the verdict.