GARTH, Circuit Judge,
concurring in part and dissenting in part:
While I agree with the majority’s conclusion that Feldman’s actions as Director of Internal Audit at the Philadelphia Housing Authority were entitled to First Amendment protection under Pickering, I find that the majority’s failure to identify any evidence supporting (1) the failure to reinstate Feld-man, (2) the excessive front pay award of $500,000, and (3) the punitive damage award imposed upon Saidel requires reversal.
Thus, I would reverse and remand to the district court with instructions that it order reinstatement of Feldman, that it vacate the front pay award of $500,000 and that it vacate the punitive damage award against Sai-del.
I
So that my disagreement with the majority may be clearly understood, I fault the majority’s opinion because it does not point to any evidence in the record nor does it discuss the relevant case law, which can support an affir-mance of the three issues I have identified. In my view, it is not sufficient to state in a conclusory manner that there is “ample evidence” to support the court’s finding (Maj. Op. at p. 832) without calling attention to at least some evidence. Nor is it sufficient to decide complex issues such as front pay or restitution with little reference to the criteria established in case law and without relating the facts of record to those criteria. Indeed, one can search long and hard in the record for the evidence which “fully support[s]” the district court’s determination that front pay to retirement was appropriate relief in this case. (Maj. Op. at p. 832.) But that search reveals nothing. One can look even harder to find evidence that would support a $500,-000 front pay award to retirement for a 38-year-old professional auditor who rejected an annual salary of $66,616 in favor of working for $12,500 annually and who has an opportunity to reestablish himself in the job market long prior to his retirement.
Finally, there is just no evidence to be found in the record of outrageous, wanton or reckless conduct on the part of Saidel. This is the standard by which punitive, damages are measured. While there is evidence in the record that supports compensatory damages — specifically Saidel’s concurrence in the decision to discharge Feldman, this meager fact alone does not warrant a punitive damage award against Saidel. The majority’s decision suggests that a supervisor’s concurrence in any unlawful discharge must result in both compensatory and punitive damages, a doctrine which Pennsylvania has yet to adopt.
In short, my quarrel with the majority is that it has taken unwarranted liberties with the record and has glossed over the lack of evidence in reaching its conclusions. Having set forth the predicate for this separate opinion, I now recite in some detail the reasons why I disagree so strongly with the majority on the three issues I have identified: reinstatement, excessive front pay and punitive damages.
II
In his original complaint, and in his amended complaint, Feldman asked to be reinstated to his former position at the housing authority. A few months before trial, PHA offered to reinstate Feldman to a different position, but at the same salary.
Thereafter, Feldman filed a motion asking the district court to rule that PHA had failed to offer him a “substantially equivalent” position and that reinstatement was not a viable remedy as a result of continuing animosity between him and PHA
Immediately before closing arguments, the district court granted Feldman’s motion. Ultimately, the jury awarded Feldman $500,000 in front pay in lieu of reinstatement: In a post-trial motion, PHA, in addition to argu *835 ing that the front pay award was improper and excessive, also argued that the district court had erred in ruling that reinstatement was inappropriate. The district court rejected PHA’s arguments.
In particular, the district court reiterated its view that reinstatement was not a feasible remedy because “[ijrreparable distrust and animosity [had] developed between Feldman and PHA as a result of the events prior to his termination, the termination itself, and the litigation that followed in its wake.” Dist. Ct. Order of 9/16/93 at 3. The district court noted that: (1) Feldman had been fired for insubordination; (2) Feldman’s ability to function as an auditor at PHA had been irrevocably impaired by his lawsuit; and (3) although Paone and Saidel no longer worked at PHA, “many of the people, with whom or for whom Feldman would work if he were to return, worked at PHA prior to his termination.” Dist. Ct. Order of 9/16/93 at 5.
In my opinion, the district court abused its discretion when it refused to reinstate Feld-man.
Ill
In employment discrimination suits, there are two alternative remedies available to compensate a claimant for future lost earnings: reinstatement or front pay. The determination of which remedy is appropriate is left to the discretion of the district court judge. Blum v. Witco Chem. Corp., 829 F.2d 367, 374 n. 4 (3d Cir.1987); Maxfield v. Sinclair Int'l, 766 F.2d 788, 796 (3d Cir.1985), cert. denied, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986). Only after the judge determines that reinstatement is not feasible, and that front pay is appropriate, does the jury calculate a front pay award. Accordingly, when we review a district court’s order to reinstate, or to deny reinstatement, we are not reviewing a jury determination. Rather, we are reviewing a judge’s ruling. In reviewing the district court’s exercise of discretion, we consider not only the reasons proffered by the district court for its determination, but also whether those reasons find support in the record.
It is well settled that reinstatement is the preferred remedy to avoid future lost earnings. Maxfield, 766 F.2d at 796; see also James v. Sears, Roebuck & Co., 21 F.3d 989, 997 (10th Cir.1994); Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 678 (7th Cir.1993); Roush v. KFC Nat’l Management Co., 10 F.3d 392, 398 (6th Cir.1993), cert. denied, — U.S. -, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994); Brunnemann v. Terra Int'l Inc., 975 F.2d 175, 180 (5th Cir.1992); Wilson v. S & L Acquisition Co., L.P., 940 F.2d 1429, 1438 (11th Cir.1991); Duke v. Uniroyal, Inc., 928 F.2d 1413, 1424 (4th Cir.1991), cert. denied, 502 U.S. 963, 112 S.Ct. 429, 116 L.Ed.2d 449 (1991); Cassino v. Reichhold Chems., Inc., 817 F.2d 1338, 1346 (9th Cir.1987), cert. denied, 484 U.S. 1047, 108 S.Ct. 785, 98 L.Ed.2d 870 (1988). Only when the evidence supports a judge’s decision that reinstatement is not feasible, may he award front pay in lieu of reinstatement. Reinstatement may not be deemed feasible (1) where the relationship between the parties has been so damaged by animosity as to make reinstatement impracticable, Robinson v. Southeastern Pa. Transp. Auth., 982 F.2d 892, 899 (3d Cir.1993); Witco Chem. Corp., 829 F.2d at 373-74; Maxfield, 766 F.2d at 796; or (2) where no comparable position is available to which the claimant can be reinstated. Witco Chem. Corp., 829 F.2d at 374; Whittlesey v. Union Carbide Corp., 742 F.2d 724, 728 (2d Cir.1984).
A.
I believe that the record simply does not support the district court’s finding that substantial animosity had developed between Feldman and PHA — as opposed to the animosity that had evolved between Feldman, on the one hand, and Paone and Saidel on the other. Nor has the majority identified any such evidence. Speculation that Saidel might, in the future, be re-elected to the position of city comptroller and, in that capacity, be permitted to appoint persons to the Board of Commissioners, which in turn governs PHA, simply is too remote to support an award of front pay in lieu of reinstatement and is no substitute for evidence. Accordingly, in my opinion, the district court’s finding of fact that Feldman could not *836 enjoy a productive working relationship with PHA were he to be reinstated, is clearly erroneous.
Unlike almost all eases in which reinstatement is denied, here there is no record evidence of lingering hostility between Feldman and any individual still working at PHA.[1] While some PHA employees testified at trial, their testimony did not reveal any animus towards Feldman. See Bingman v. Nothin & Co., 937 F.2d 553, 558 (10th Cir.1991) (affirming district court’s finding that work place would not be unduly hostile where “all persons involved in plaintiffs termination testified, and none showed animosity toward him because of [his] lawsuit”).
Most importantly, Paone and Saidel no longer work for the Philadelphia Housing Authority. See, e.g., Rodgers, 12 F.3d at 678 (affirming district court’s award of reinstatement where supervisor, whose racial comments had been the impetus for Rodgers’ Title VII action, no longer worked for Western-Southern); Marshall v. TRW, Inc., 900 F.2d 1517, 1523 (10th Cir.1990) (reversing award of front pay where two employees who made the decision to discharge Marshall were no longer employed by TRW); Morgan v. The Arkansas Gazette, 897 F.2d 945, 953 (8th Cir.1990) (affirming reinstatement order where any animosity was eradicated inasmuch as employees responsible for the discrimination no longer worked for The Arkansas Gazette); Jackson v. City of Albuquerque, 890 F.2d 225, 232 (10th Cir.1989) (reversing district court’s denial of reinstatement where “most of those making eom-plaints against [Jackson] are no longer employed” by the City’s park department).
Although this might be a very different case were Paone and Saidel still employed by PHA, quite clearly, they are not. See, e.g., Grantham v. Trickey, 21 F.3d 289, 296 (8th Cir.1994) (concluding that unacceptable level of hostility existed and, thus, reinstatement not feasible, inasmuch as claimant would have to report to supervisor with whom he had “the most bitter conflicts”); Price v. Marshall Erdman & Assocs., Inc., 966 F.2d 320, 325 (7th Cir.1992) (disapproving “reinstatement of a high-level employee performing discretionary functions into the division from which he was fired and which remains under the management of the person who fired him”). That distinction dictates a vastly different result from that reached by the district court and now affirmed by the majority of this court.
In addition, between the time Feldman filed his first complaint and the time he filed his amended complaint, HUD took over PHA and appointed a special master to assume control of the housing authority’s daily operations. PHA, under new management, has given every indication that it would like to see Feldman return. Although the litigation of Feldman’s claim may have generated animosity, that animosity, as I have pointed out, was generated by or against Paone and Sai-del, and not by or against PHA. Moreover, despite the majority’s reliance upon this factor, the existence of litigation-based hostility, without more, generally is not sufficient to *837 defeat reinstatement.[2] (Maj. Op. at p. 832). Whether or not it might be uncomfortable for Feldman to return to work at PHA, our jurisprudence implicitly tolerates such discomfort as an unavoidable concomitant of our well-established preference for reinstatement over front pay.
Coneededly, the general rule is that a district court may exercise its discretion to award front pay in lieu of reinstatement. Its determination, however, must be well reasoned and supported by record evidence. Here, there is not even a scintilla of evidence that Feldman’s working relationship with PHA, as distinguished from his relationship with the now absent Paone and Saidel, would be tainted by any animosity. Unfortunately, the majority, as I have earlier indicated, has not called our attention to any evidence supporting the district court or its conclusion. This is not surprising as there is no such evidence disclosed in the record.
Thus, inasmuch as the district court’s determination that reinstatement was not feasible was grounded on its unsupported and, therefore, erroneous finding that there was unabated hostility between Feldman and PHA, the district court’s determination was an abuse of discretion.
B.
It should not be overlooked, as I have emphasized, that the question of whether reinstatement, in fact, is viable, is a question for the judge and not the jury. Thus, it is the judge who must determine whether the claimant’s former position still exists or whether it has been eliminated, whether a comparable position is available, whether reinstatement should proceed, and how. In the present case, not only did PHA make an offer of reinstatement, but it conceded that, regardless of PHA’s offer, had the district court ordered reinstatement, PHA. would have been obligated to reestablish Feldman’s position, and reinstate him to it.
. Although the district court found that the position offered by PHA to Feldman before trial was not substantially equivalent to the one Feldman held before he was fired, the district court did not make any explicit findings as to whether some other substantially equivalent position existed at PHA to which Feldman could be reinstated.[3] See, e.g., Anderson v. Phillips Petroleum, Co., 861 F.2d 631, 638 (10th Cir.1988) (reversing award of front pay and ordering reinstatement where company could have reinstated Anderson to a comparable position); cf. Nelson v. Boatmen’s Bancshares, Inc., 26 F.3d 796 (8th Cir.1994) (upholding district court front pay award where district court found that Nelson’s position no longer existed.and that there was no comparable position to which he could be reinstated). Nor did the district court make a determination with respect to whether a position could have been created to which Feldman could be reinstated.
PHA asserted at oral argument that Feld-man could have been reinstated to the exact same position he held before he was fired. I grant that this somewhat belated assertion *838 must be accepted with a measure of skepticism inasmuch as it differs from the position advanced by PHA before the district court. There PHA argued that IAD had been completely reorganized and that its pre-trial offer to Feldman of “Chief, Procurement Audit Unit” was the best it could do. In this connection, Feldman had claimed before the district court that his former position, “Director of Internal Audit,” had been renamed “Manager of Internal Audit” and that, at the time of trial, the position was filled by a former subordinate, Edward Merenda.
I am satisfied that reinstatement still would be feasible, and an available remedy, even though a third person might now occupy Feldman’s former position. For example, in Reeves v. Claiborne County Bd. of Ed., 828 F.2d 1096, 1101-02 (5th Cir.1987), the district court refused to reinstate Reeves to her former position because a replacement had been hired during the course of the litigation. The Fifth Circuit reversed:
If the existence of a replacement constituted a complete defense against reinstatement, then reinstatement could be effectively blocked in every case merely by hiring an innocent third party after the retaliatory purpose was achieved.... While reinstatement may displace an innocent employee, the “[e]nforcement of constitutional rights [may have] disturbing consequences. Relief is not restricted to that which would be pleasing and free of irritation.”
Id. at 1102 (citations omitted); see also Brunnemann, 975 F.2d at 180 (affirming reinstatement order even though Brunne-mann’s former position already was held by another employee where there was no evidence of animosity or hostility between the parties). Contra United States E.E.O.C. v. Century Broadcasting Corp., 957 F.2d 1446, 1463 (7th Cir.1992) (holding reinstatement not feasible where claimant’s position had been filled by third party).
I see no reason why reinstatement here could not be ordered as it is with respect to workers who are discharged as the result of, or who go out on strike to protest, an employer’s unfair labor practice. “Under those circumstances, the striking employees do not lose their status [as employees] and are entitled to reinstatement with back pay, even if replacements for them have been made.” Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 278, 76 S.Ct. 349, 355, 100 L.Ed. 309 (1956). That is, an employer must dismiss replacement workers if necessary to make room for the returning unfair labor practice strikers. NLRB v. International Van Lines, 409 U.S. 48, 50-51, 93 S.Ct. 74, 76-77, 34 L.Ed.2d 201 (1972); see, e.g., Aguayo for NLRB v. Tomco Carburetor Co., 853 F.2d 744, 750 (9th Cir.1988) (rejecting Tomco’s argument that reinstatement would be inappropriate because eleven innocent workers would have to be discharged and holding that “the rights of the employees who were dis-criminatorily discharged are superior to the rights of those whom the employer hired to take their places”). Inasmuch as Feldman was fired, essentially, as the result of an unfair labor practice, I see no reason why his right to reinstatement — the relief he requested originally and our preferred remedy— should be subordinated to the rights of whichever employee was hired to replace him.
In light of the unequivocal representation made by PHA to us that, if reinstated, Feld-man would have his former position reactivated, I would remand to the district court to accept PHA’s offer and to order that Feld-man be reinstated as Director of Internal Audit or its equivalent with appropriate back pay.
IV
Even if front pay were appropriate in the present ease, the $500,000 actually awarded to Feldman by the jury was clearly excessive. See Williams v. Martin Marietta Alumina, Inc., 817 F.2d 1030, 1038 (3d Cir.1987).
A.
PHA argues that Feldman should not have been granted front pay until the age of retirement but, rather, until a point in time at which he “would be expected to regain a position at the level of the one he lost when his employment was terminated.” Appellant’s Br. at 43.
*839 The time period over which the jury calculated its front pay award goes to the heart of the question of whether that award was excessive. We have held that “[i]n selecting a cut-off date for an equitable front pay remedy the [district] court exercises discretion.” Goss v. Exxon Office Sys. Co., 747 F.2d 885, 890 (3d Cir.1984). Accordingly, in determining whether the front pay amount awarded by the jury was excessive, it is proper for us to consider whether the district court’s front pay instruction to the jury caused the jury to return with a front pay award that was excessive.[4] That instruction required that the jury calculate its front pay award “from the date of judgment to the date of retirement by the plaintiff.”
I conclude that the district court abused its discretion in selecting a cut-off date (“retirement”), which was unreasonable in the context of this case. As a result, the jury granted to Feldman an excessive front pay award.
B.
The purpose of front pay is to make an injured employee whole by compensating him for future lost earnings resulting from his wrongful termination. The future, of course, is unknown, and we have been reluctant to award front pay where such an award would be overly speculative. Goss, 747 F.2d at 889. Common sense dictates that the farther into the future a front pay award reaches, the more speculative it becomes. Consequently, “[a] claimant’s work and life expectancy are pertinent factors in calculating front pay.” Anastasio v. Schering Corp., 838 F.2d 701, 709 (3d Cir.1988).
When a plaintiffs work expectancy is relatively short, it is not overly speculative and, therefore, appropriate to award front pay “to retirement.” Duke v. Uniroyal, Inc., 928 F.2d 1413, 1424 (4th Cir.1991) (“If a plaintiff is close to retirement, front pay may be the ■only practical approach.”). Thus, in ADEA cases, front pay often is awarded from the date of discharge to the date of retirement based on the assumption that, in many instances, ADEA claimants will not work long enough to reestablish themselves in the marketplace, See, e.g., Witco Chem. Corp., 829 F.2d at 374-76 (awarding “front pay-to-retirement” where plaintiffs were all within eight years of normal retirement age when terminated and, therefore, it was not overly speculative to assume that the plaintiffs would have finished their working careers working for Witco).
This is not to say, however, that all front pay awards should be calculated to the plaintiffs date of retirement. In fact, not even all ADEA claimant’s are entitled to “front pay-to-retirement.” See Anastasio, 838 F.2d at 709 (“The purpose of front pay under the ADEÁ is to ensure that a person who has been discriminated against on the basis of age is made whole, not to guarantee every claimant who cannot mitigate damages by finding comparable work an annuity to age ■ 70.”); Davis v. Combustion Eng’g, Inc., 742 F.2d 916, 923 (6th Cir.1984) (noting that an award of front pay to 41-year old until normal retirement age might be unwarranted while failure to make such an award to 63-year old might be an abuse of discretion).[5]
*840 In those eases in which the plaintiff is not close to retirement age, the expectation that he will continue working tempers the need for “front pay-to-retirement,” the award of which might constitute a “windfall” for the plaintiff. Standley v. Chilhowee R-IV School District, 5 F.3d 319, 322 (8th Cir.1993). In such cases, one can only speculate “how long the plaintiff actually would have remained working at the job, whether the plaintiff soon would have left for a different, perhaps better-paying, job, or whether the plaintiff soon would have been dismissed for legitimate reasons.” Id. Consequently, the general rule in such cases is that front pay may only be awarded “for a reasonable future period required for the victim to reestablish her rightful place in the job market.” Goss, 747 F.2d at 889; see also Cassino v. Reichhold Chems., Inc., 817 F.2d at 1347 (9th Cir.1987) (stating that front pay is intended to be temporary in nature).
Just as it is a plaintiffs duty to mitigate his damages prior to trial, see Ford Motor Co. v. EEOC, 458 U.S. 219, 232, 102 S.Ct. 3057, 3066, 73 L.Ed.2d 721 (1982), it is expected that he will continue to mitigate his damages into the future. Maxfield, 766 F.2d at 796 (recognizing that plaintiff’s duty to mitigate serves as a control on front pay damage awards); Whittlesey, 742 F.2d at 728 (noting that award of front pay “does not contemplate that a plaintiff will sit idly by and be compensated for doing nothing”).
The Second Circuit explained this concept of “future mitigation” in Dominic v. Consolidated Edison Co., 822 F.2d 1249 (2d Cir.1987), a case in which the Court of Appeals upheld a district court’s decision to reduce an ADEA claimant’s front pay award:
Had Con Edison proved that Dominic failed to mitigate damages — for example, by refusing a substantially equivalent job — Dominic's back-pay award would have been cut off or reduced at the time of his failure to mitigate and any front-pay award would have been foreclosed. See Ford Motor Co. v. EEOC, 458 U.S. 219, 233-34 [102 S.Ct. 3057, 3066, 73 L.Ed.2d 721] (1982). However, Con Edison’s failure to show that Dominic had not mitigated damages does not entitle him to a lifetime front-pay award. In calculating the size of a front-pay award the court must estimate the plaintiff’s ability to mitigate damages in the future.
Id. at 1258 (affirming district court’s award of two years front pay) (emphasis added). It follows that a plaintiff may only receive front pay for that period of time reasonably necessary for him to mitigate his losses. See Cassino, 817 F.2d at 1347 (reversing front pay award where jury, “without instruction on mitigation, found that Cassino was entitled to front pay from the time of trial until the time he would have retired”); Fitzgerald v. Sirloin Stockade, Inc., 624 F.2d 945, 956 (10th Cir.1980) (awarding front pay for five years to reflect amount of time necessary for plaintiff to reach the current salary of the position from which he was fired).
Simply stated, the longer a plaintiff is expected to work, the more likely it becomes that he will have sufficient opportunity to mitigate his damages. Given this likelihood of mitigation, the longer the period upon which a front pay award is based, the more likely that the award will be overly speculative.
C.
In the present case, Feldman was fired from an auditing position at which he was earning $66,616 per year. Prior to trial, HUD, which had taken over PHA, offered to reinstate Feldman to an auditing position, at his old salary. Feldman refused the offer. Six months after his discharge, Feldman had accepted a non-salaried “sales-like” position with the Individual Financial Services Division of the CIGNA Corporation — a position unrelated to auditing — which paid Feldman $12,500 a year.
I agree that PHA’s actions caused Feld-man significant harm. Feldman testified that his firing had an emotional effect on his family life. The jury awarded him $50,000 to compensate him for his mental and emotional distress.
Front pay, however, is not intended as damages for mental distress. Rather, front pay is designed to reimburse a claimant for *841 his future lost earnings. I do not believe that, under the circumstances, it was reasonable for Feldman to refuse a job similar (though not identical) to the one from which he was fired — a job that would have paid him $66,616 a year — when he was earning only $12,500 in a field unrelated to the one for which he was trained. Rather, I am convinced that, had Feldman acted reasonably, he would not have suffered a future loss of the magnitude that is reflected in the jury’s outrageous $500,000 front pay award.
Furthermore, I would conclude that the $500,000 front pay award was excessive, even if I were persuaded that Feldman, in fact, was justified in turning down HUD’s reinstatement offer. At the time of trial, Feld-man was thirty-eight years old. By all accounts, he is a highly trained professional. He has been in the work force for fewer than twenty years. He will be part of the work force, one can expect, for, at least, another twenty-seven years. In light of these uncon-troverted facts, there can be no justification for, just as there is no legitimate evidence supporting, the $500,000 front pay award, calculated to Feldman’s retirement age of 65.
Under these circumstances, to have permitted the jury to consider a front pay award to retirement was an abuse of discretion on the part of the district court. While we have never said so explicitly, I believe that it was the district court’s responsibility to determine, and then to instruct the jury as to, a finite period over which the jury should have calculated its front pay award. At worst, the district court should have instructed the jury to award front pay “for a reasonable future period required for [Feldman] to reestablish [his] rightful place in the job market.” Goss, 747 F.2d at 889. Whichever is the correct approach, clearly the district court abused its discretion when it directed the jury to calculate Feldman’s front pay award to retirement.
I conclude that the jury’s highly speculative front pay award — $500,000—given the circumstances, was so “grossly excessive as to shock the judicial conscience.” Williams, 817 F.2d at 1038. I would direct that the front pay award be vacated.
Saidel argues that the jury’s verdict against him on both his compensatory and punitive liability must be reversed for lack of sufficient evidence. While I agree with the majority that the record could be read to support the jury’s finding with respect to Saidel’s compensatory liability, I do not believe that there was sufficient evidence to satisfy the stricter standard which must be met in order for a jury to award punitive damages.
Punitive damages may be awarded in § 1983 actions “for conduct that is outrageous, because of the defendant’s evil motive or his reckless indifference to the rights of others.” Smith v. Wade, 461 U.S. 30, 46-47, 103 S.Ct. 1625, 1635-36, 75 L.Ed.2d 632 (1983), quoting Restatement (Second) of Torts § 908(2). See also Savarese v. Agriss, 883 F.2d 1194, 1204 (3d Cir.1989). Pennsylvania has adopted the same standard for awarding punitive damages. See Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265, 1277 (3d Cir.1979) (in banc); Rizzo v. Haines, 520 Pa. 484, 555 A.2d 58, 69 (1989).
I find nothing in the record which suggests that Saidel’s single action of “concurring” in Paone’s decision to terminate Feldman’s employment was so “outrageous” as to merit the imposition of punitive liability. Nor has the majority directed our attention to any such evidence of that nature. There is just no evidence in the record that Saidel’s action exhibited a reckless or callous disregard of, or indifference to, Feldman’s rights. Nor is there any evidence that Saidel’s conduct was outrageous. See Tunis Brothers Co. v. Ford Motor Co., 952 F.2d 715, 739-40 (3d Cir.1991).
Concededly, the record suggests that Sai-del was made aware of Feldman’s IAD reports. There also is record evidence that Paone conferred with Saidel before firing Feldman, just as there is record evidence that Saidel concurred in Paone’s decision to fire Feldman.[6]
*842 Discharging an employee, however, can be a neutral, non-discriminatory action. Here, there is no' direct evidence that Saidel had knowledge of Paone’s discriminatory motive in firing Feldman. Nor is there any direct evidence that Saidel concurred in Paone’s decision because of his own personal discriminatory motive.
In Keenan v. City of Philadelphia, 983 F.2d 459 (3d Cir.1992), we vacated the punitive damages awarded against Philadelphia’s Police Commissioner even though we upheld the compensatory damages imposed against him. We held that even though Police Commissioner Tucker “had been fully aware of the actions of his subordinate command personnel in this particular case,” this fact alone could not justify the imposition of punitive damages against him. Id. at 471.
This case is much the same as Keenan and highlights the rule that “despite its utility as a deterrent, the punitive damage remedy must be reserved ... for cases in which the defendant’s conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief.” Cochetti v. Desmond, 572 F.2d 102, 106 (3d Cir.1978). See also Savarese, 883 F.2d at 1205 (3d Cir.1989) (noting that “punitive damages in general represent a limited remedy, to be reserved for special circumstances”).
Here, where there is only minimal evidence supporting Saidel’s liability for compensatory damages, and no evidence which would tend to show that Saidel’s actions were in any way “outrageous,” I believe that the imposition of punitive damages against Saidel was inappropriate and should be vacated.
VI
In sum, I would reverse and remand to the district court with instructions that it order the reinstatement of Feldman at the same salary to the same position or an equivalent position to the one he previously held at PHA. I would vacate the front pay award of $500,000 as inappropriate upon Feldman’s reinstatement and alternatively as excessive under the circumstances of this ease. Finally, I would vacate the $10,000 award of punitive damages against Saidel.
I respectfully dissent from so much of the majority’s opinion as holds otherwise.
ORDER AMENDING OPINION
January 23, 1995
IT IS ORDERED that:
1. Page 831 of the opinion in the above matter entered on December 22, 1994, is amended by adding the following new paragraph to the end of Section A-l: [Editor’s Note: Amendment incorporated for purposes of publication.]
2. The eight-day period provided in IOP 8.2 and 9.5.4 for voting on the petitions for rehearing currently before the court on behalf of the Philadelphia Housing Authority, as to Nos. 93-1978, 93-2115 and 93-2139; J.A. Saidel, as to Nos. 93-1977 and 93-2129; and John Paone as to Nos. 93-1977 and 93-2115 will begin on the date this order is entered, and further orders disposing of those petitions will be entered at the end of that period.
*843 Before: SLOVHER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, McKEE, SAROKIN, GARTH, and PRATT, Circuit Judges.

. See Grantham, 21 F.3d at 296 (holding hostility necessary to support award of front pay "must go beyond the normal hostility between parties to litigation"); United States E.E.O.C. v. Century Broadcasting Corp., 957 F.2d 1446, 1462 (7th Cir.1992) (rejecting claim of hostility where only hostility present was that “hostility common to litigation”); Walther v. Lone Star Gas Co., 952 F.2d 119, 127 (5th Cir.1992) (vacating award of front pay where district court stated only that the litigation was “protracted and necessarily vexing" and did not support its finding with specific instances of discord); Goldstein v. Manhattan Indus., Inc., 758 F.2d 1435, 1448 (11th Cir.1985) (affirming reinstatement of plaintiff who had argued that litigation caused ill feelings between himself and persons who would be his immediate superiors, but where supervisor testified that he would be happy to have plaintiff back under same terms as when he left); Dickerson v. Deluxe Check Printers, Inc., 703 F.2d 276, 281 (8th Cir.1983) (holding, "friction arising from the litigation process itself is not alone sufficient to deny employment”). Cf. Berndt v. Kaiser Alum. & Chem. Sales, Inc., 789 F.2d 253, 261 (3d Cir.1986) (upholding district court’s award of front pay in lieu of reinstatement where "relationship between plaintiff and Kaiser has been so damaged by the litigation that a continued working relationship for the four months remaining until plaintiff will retire- is not feasible").

. Front pay also may be awarded in lieu of reinstatement where no comparable position is available to which the claimant can be reinstated. Witco Chem. Corp., 829 F.2d at 374; Whittlesey, 742 F.2d at 728 (2d Cir.1984).

. PHA's requested jury instruction, which was not granted by the district court, did not limit the end date to "retirement.” Rather, it would have instructed the jury, among other things, that “[i]f you decide to award [front pay], front pay begins today. It ends when James Feldman would have stopped working for PHA (because of retirement or termination or otherwise) in the absence of dismissal.”
Despite the majority’s contention to the contrary (Maj.Op. at p. 832), the district court did not leave it to the jury to determine the termination date for front pay. Rather, the district court instructed the jury to award front pay from the date of judgment to the date of retirement. See id. at 832. Thus, the instruction given by the district court to the jury was fundamentally different from the instruction requested by PHA. The PHA instruction, as noted in text, left to the jury the appropriate cutoff date for front pay.

. It is not surprising that relevant caselaw reveals that “front pay-to-retirement” only has been awarded where the plaintiff is close to retirement age. See, e.g., Boehm v. American Broadcasting Co., Inc., 929 F.2d 482, 488 (9th Cir.1991) (awarding six years "front pay-to-retirement” where district court found that Boehm would not be able to obtain a position equivalent to his former job); Witco Chem. Corp., 829 F.2d at 373-74 (awarding “front pay-to-retirement” where plaintiffs were within eight years of retirement); Davis, 742 F.2d at 923 (approving jury’s $88,000 front pay award, based on district *840 court’s finding that Davis was 59 years old and facing mandatory retirement in six years).

. Saidel testified at his deposition as follows:
Q: When you had the conversation with Mr. Paone regarding Mr. Feldman's firing did Mr. Paone ever say to you that he wanted Feldman fired for giving information to the HUD inspector general?
*842 A: If I’m not mistaken he mentioned to me that one of the things he felt was a problem was that ... Mr. Feldman did not follow the chain of command.
App. VI at 1306. At trial, Saidel testified as follows:
Q: Do you recall discussing Mr. Feldman's firing with Mr. Paone before he was fired?
A: I didn’t discuss it with Mr. Paone. Mr. Paone told me that he was contemplating dismissing Mr. Feldman.
App. VIII at 2238. Paone testified as follows:
A: ... I discussed the situation with Mr. Saidel based on the meeting that I had with Mr. Feldman and I told Mr. Saidel that I wanted to terminate Mr. Feldman, asked his concurrence, he concurred.
Q: Did you actually terminate him that week?
A: No. I terminated him two weeks later, May 3d.
Q: And what was the reason for the delay?
A: Well there’s a number of reasons. We spent a day in Richmond, when I came back I talked to both Rich Brown who is the Director of Human Resources and Mr. Saidel again. Mr. Saidel had a concern that [objection omitted] ... Mr. Saidel's concern was that there would be a perception because of Mr. Feld-man’s position in terminating an Internal Auditor that we should touch base with relevant Federal officials first.
App. VII at 1625-27.